**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **UNITED STATES**<br><br>**v.**<br><br>**BETHANY ABIGAIL TERRILL** | **Docket No. 26-CR-10073** |

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM CELL PHONE AND MEMORANDUM IN SUPPORT

Defendant, Bethany Terrill, respectfully moves this Court to suppress evidence obtained through an unlawful search of her personal cell phone. During a confrontation with federal agents initiating an immigration arrest outside a state courthouse, Ms. Terrill recorded a video of part of the encounter on her cell phone. After the encounter, an agent seized the phone to extract the video. Ms. Terrill asked for her phone to be returned to her repeatedly. In an effort to secure possession of the phone, she gave verbal consent and her passcode to the agent for the sole purpose of allowing him to view the video of the encounter on her phone; she also offered to send it to him, but the agent ultimately refused to return the phone and stated she could pick it up after a phone extraction had been completed. Her phone has not been returned to her.

An agent later submitted a warrant application to search the phone. The affidavit in support of the application was filled with boilerplate language and deficient for several reasons, including that it did not establish probable cause that Ms. Terrill had committed a crime, it did not draw a sufficient nexus between evidence of the crime and Ms. Terrill's phone, and it was not particularized and requested authorization for a fishing expedition. But even if the warrant was validly issued, the evidence seized went outside the scope of the warrant. None of the exceptions

1

to the exclusionary rule apply. As a result, Ms. Terrill asks this Court to exclude the fruits of the search and unlawfully seized evidence from trial.

## I.     FACTS

On October 23, 2025, Federal Bureau of Investigation Special Agent Corrinne Nemis submitted a revised application for a warrant to search Ms. Terrill's phone. Aff. in Support of App. for a Search Warrant, FBI Special Agent Corrinne Nemis, Oct. 23, 2025, attached as Exhibit A. Agent Nemis initially submitted a warrant application on October 9, 2025 that inaccurately described Ms. Terrill's phone, and a warrant was issued that day. *See id.* at ¶6. The government informed undersigned counsel that the agent submitted a revised affidavit and secured a new warrant before the search was executed.

The agent stated she has been working for the FBI since 2024. *Id.* at ¶1. She had completed the FBI's law enforcement Training Academy and was assigned to the Boston Field Division where she was a member of the Homeland Security Task Force. *Id.* Her investigations included the use of "execution of search and seizure warrants," and "[b]ased on [her] training, and information provided to [her] by other law enforcement officers, [she was] familiar with the techniques used by individuals engaged in the commission of various criminal offenses." *Id.* at ¶2. She said she was investigating Ms. Terrill "for threatening to assault or murder a federal law enforcement officer" in violation of 18 U.S.C. § 115(a)(1)(B). *Id.* at ¶3.

In support of her contention that there was probable cause that Ms. Terrill had committed a crime, Agent Nemis stated that on September 29, 2025, Special Agents from Homeland Security Investigations, Immigration and Customs Enforcement, and the FBI were working as part of a multi-agency effort to support ICE Enforcement and Removal Operations in effecting the arrest of an individual near Malden District Court. *Id.* at ¶7. The individual was the subject of an

administrative immigration arrest. The agents were wearing law enforcement identifiers, including "badges, body armor vests with agency placards, or other outer garments that clearly displayed the name of the agency with which the Agent was employed." *Id.* at ¶8. The agent stated that "[t]he three FBI SAs who were present were also equipped with active body worn cameras ("BWC"), which recorded the interaction between the Agents and TERRILL." *Id.*; *see also* Bodyworn Camera Footage, Sept. 29, 2025, hand delivered via USB as Exhibit B.

Upon reviewing the bodycam footage and speaking with the agents, Agent Nemis submitted that at approximately 11:32 AM, the agents on scene observed the target of their arrest exiting the Malden District Court following his arraignment on one count of leaving the scene of property damage. *Id.* at ¶9. As the agents approached him and put him in handcuffs, Ms. Terrill, "a bystander walking toward the entrance of the courthouse, approached the Agents," allegedly began "screaming at and pushing through the Agents to capture a video recording on her mobile telephone." *Id.*

Ms. Terrill began shouting statements including "ICE is here, ICE is here," "You guys are monsters, this is insane," "Sir, what's your name, what's your name," "I can try to help you," and "I am an American civilian I have a right to be here." *Id.* The arresting agents allegedly told Ms. Terrill "to 'back up' several times." *Id.* Ms. Terrill allegedly tried to push past the agents and, according to Agent Nemis, "failed to comply with any commands." *Id.* The agents told Ms. Terrill she could be arrested if she did not give them space to complete the arrest. They were reportedly "actively securing" the handcuffs on their target and "searching him" while Ms. Terrill continued to intercede. *Id.* The affidavit states that Ms. Terrill was "belligerent and became increasingly aggressive." *Id.* at ¶10. She yelled profanities, including calling the agents "Nazis" and "disgusting." *Id.*

3

While the agents were "leading [the target] to the car," Ms. Terrill yelled, "Charlie Kirk died, and we love it . . . we're coming for you, gonna kill you." *Id.* An FBI agent "who was initially walking in the opposite direction of TERRILL," heard the alleged threat, turned around, and detained her to allegedly "ensure that she did not have a weapon or other means to immediately carry out the threat." *Id.* No weapon was found.

As the agent attempted to detain Ms. Terrill, she resisted and allegedly "fought to escape," and three additional agents were called to assist in putting her in handcuffs. At one point, Ms. Terrill, who was wearing long acrylic nails, allegedly "hooked her finger on one cuff to prevent the Agents from latching the second cuff onto her wrist." *Id.* She was told to undo her finger, but she reportedly "remained resistant and non-compliant and continued screaming." *Id.*

After restraining Ms. Terrill, the agents "informed her that they were seizing her phone, which they believed had evidence of her threat." *Id.* at ¶11. Ms. Terrill repeatedly denied she made any threatening statements and "told the Agents to play the video from her phone so that [the phone] would not be detained." *Id.* She provided her passcode to the agent to allow him to play the video. *Id.* at ¶12. The agents replayed the video from Ms. Terrill's phone and decided that "it clearly captured TERRILL threatening to kill the Agents." *Id.* at ¶11. Ms. Terrill reiterated part of her statement, "We are coming for you. We don't like Nazis in America." *Id.*; *see also* Exhibit B (showing Ms. Terrill's repeated attempts to get her phone back because she needed it for her court hearing and stating passcode for agent to view only the video in question).

The remainder of Agent Nemis's affidavit is not specific to Ms. Terrill, her actions, or her phone. It states that according to the agent's training and experience, "individuals frequently use mobile telephones to carry out, communicate about, and store records regarding their daily activities." *Id.* at ¶14. This includes messaging and email, including "internet based messages,"

keeping a calendar, arranging travel, making purchases, banking, running searches, and so on. *Id.* The agent added that "smartphones . . . can now function essentially as small computers" because they have cameras, GPS navigation, and can store large amounts of data. *Id.* at ¶15. "Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device." *Id.* The agent then included information about how deleted files can be recovered from electronic devices. *Id.* at ¶17.

The warrant application included two attachments. Attachment A described Ms. Terrill's phone as a tan or off-white color iPhone. *See* Exhibit A at Attachment A. Attachment B included a list of "items to be seized," including "all records, in whatever form . . . that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 115," including those related to:

A. "[P]eople, entities, physical addresses, telephone numbers" of Malden District Court, Charlie Kirk, and federal immigration officers;

B. Evidence of the interaction at issue on September 29, 2025;

C. Travel or whereabouts of Ms. Terrill on that day;

D. "Evidence of the defendant's intent, including information related to immigration enforcement, violence against law enforcement, and the assassination of Charlie Kirk";

E. Evidence of who used, owned, or controlled the phone;

F. Evidence of the presence of absence of malware and software to detect malware;

G. Evidence of forensic programs designed to eliminate data;

H. Evidence of the times the phone was used;

I. Passwords, encryption keys, and other access devices to access the phone;

J. Serial numbers or electronic identifiers of the phone

*See* Exhibit A at Attachment B.

Notably, the original Attachment B submitted on October 9, 2025 included under paragraph A a two-week time limitation: "for the period of time from September 15, 2025 to September 29, 2025." The revised application did not include this temporal limit.

A federal magistrate authorized the search warrant as requested on October 23, 2025. Search Warrant, Case No. 225-mj-8549-PGL, Oct. 23, 2025, attached as Exhibit C.

The evidence seized from the subsequent search of Ms. Terrill's cell phone were largely images that she saved in her Photos app. They consist of: (1) screenshots of private DMs with another Instagram account; (2) screenshots of her comments on Instagram posts; (3) a screenshot of a post on her Instagram "For You Page"; (4) screenshots of her comments on Facebook posts; (5) a screenshot of one of her Facebook posts; (6) a screenshot of another Facebook profile posting screenshots of her comments; (7) a screenshot of a Pod Save America podcast episode on Charlie Kirk's assassination; (8) two pictures of her holding a firearm on an undisclosed date; (9) a picture of a meme referencing a firearm; (10) a still frame of the video she took during the encounter, depicting a police officer wearing a mask;[1] and (11) the video of part of the encounter.

On March 19, 2026, the grand jury returned an indictment against Ms. Terrill charging her with influencing, impeding, or retaliating against a federal official by threatening in violation of 18 U.S.C. §§ 115(a)(1)(B) and (b)(4). Dkt. #21. A jury trial is scheduled for September 14 to 16, 2026. Dkt. #33.

## II.    LEGAL STANDARDS

To raise a challenge to a search and seizure under the Fourth Amendment, one "must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized." *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004) (quotation marks omitted;

---

[1] It is unclear whether Ms. Terrill took this photograph or if it appeared as a still frame in the government's phone extraction. Undersigned counsel has requested from the government the metadata underlying the phone extraction.

quoting *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988)). The analysis is two-fold: "first, whether the defendant had an actual, subjective, expectation of privacy; and second, whether that expectation is 'one that society is prepared to recognize as objectively reasonable.'" *United States v. Battle*, 637 F.3d 44, 48-49 (1st Cir. 2011) (quoting *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009)).

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation[.]" U.S. Const. amend. IV. To determine whether a search warrant affidavit establishes probable cause, courts consider the totality of the circumstances based on the "'facts and supported opinions' set out within the four corners of the affidavit." *United States v. Corleto*, 56 F.4th 169, 175 (1st Cir. 2022) (quotation marks omitted; quoting *United States v. Lindsey*, 3 F.4th 32, 39 (1st Cir. 2021)). The probable-cause inquiry is two-fold: "[a]n application for a warrant must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched – the so-called 'nexus' element." *United States v. Gonzalez*, 113 F.4th 140, 148 (1st Cir. 2024) (quotation marks omitted; quoting *United States v. Roman*, 942 F.3d 43, 50 (1st Cir. 2019)).

"The latter condition, known as the 'nexus' requirement, demands a 'fair probability – not certainty – that evidence of a crime will be found in a particular location.'" *Corleto*, 56 F.4th at 175 (internal quotation marks omitted; quoting *United States v. Lindsey*, 3 F.4th 32, 39 (1st Cir. 2021)). "Nexus can be 'inferred from the type of crime, the nature of the items sought, . . . and normal inferences as to where the criminal would hide [evidence of a crime].'" *Id.* (quoting *Lindsey*, 3 F.4th at 39).

In addition to the probable cause requirement, the Fourth Amendment instructs that "no Warrants shall issue, but upon . . . particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "This particularity requirement exists 'to prevent wide-ranging general searches by the police.'" *Corleto*, 56 F.4th at 175 (quoting *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019)). "[S]earches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of the intrusion per se, but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "[A] valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." *Lindsey*, 3 F.4th at 40 (quotation marks omitted; quoting *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013)).

Relatedly, the scope of a search "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). "Whether a search exceeds the scope of a search warrant is an issue [courts] determine through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." *United States v. Pimentel*, 26 F.4th 86, 90 (1st Cir. 2022) (internal quotation marks omitted; quoting *United States v. Hitchcock*, 286 F.3d 1064, 1071 (9th Cir. 2022)).

Under the "plain view" exception, evidence obtained in violation of the Fourth Amendment need not be suppressed if three requirements are met: (1) the officer must not have violated the Fourth Amendment in "arriving at the place from which the evidence could be plainly viewed"; (2) the incriminating nature of the evidence must be "immediately apparent"; and (3) the officer

must have "a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 137 (1990); *see also United States v. Hernandez-Mieses*, 931 F.3d 134, 140 (1st Cir. 2019); *United States v. Hamie*, 165 F.3d 80, 82 (1st Cir. 1999).

Finally, "[t]he exclusionary rule provides that evidence seized in violation of the Fourth Amendment is ordinarily remedied by suppression." *Pimentel*, 26 F.4th at 90. In *United States v. Leon*, 468 U.S. 897, 922 (1984), the Supreme Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." This is known as the "good-faith exception" to the exclusionary rule. The Supreme Court cautioned in *Leon*, "We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms." *Id.* "[T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (internal citation omitted). The good-faith exception does "not apply in cases where the issuing magistrate wholly abandoned his judicial role . . . in such circumstances, no reasonably well trained officer should rely on the warrant." *Id.* at 923. "Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)). "Finally, depending on the circumstances in the particular case, a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id.*

## III.   ARGUMENT

### A. Ms. Terrill had a reasonable expectation of privacy in the images saved on her personal cell phone, which she protected with a private passcode.

Ms. Terrill had a reasonable expectation of privacy in the contents of her personal cell phone, which was passcode-protected, and where she privately stored the images seized from her iPhone Photos app. Just last month, the First Circuit recognized that "[b]road searches of cell phones are necessarily intrusive, and can raise difficult questions," stating that "cell phones today include vast amounts of personal data, which – taken together – can paint a detailed portrait of a person's life." *United States v. Deschambault*, No. 24-1275, 2026 WL 1382783 at \*17 (1st Cir. May 18, 2026) (citing cases including *Carpenter v. United States*, 585 U.S. 296, 305 (2018); *Riley v. California*, 573 U.S. 373, 393-96 (2014)).

Ms. Terrill's phone holds troves of personal information, including her personal photos, videos, and social media history. She protected her phone with a passcode so that it would not be accessible to anyone but her. While she disclosed the passcode to the agent for the limited purpose of allowing him to view only the video of the encounter, she was being held by multiple armed agents, in handcuffs, and faced with the prospect of losing her phone and her arguments at her hearing at Malden District Court. *See* Exhibit B. Her disclosure of the passcode was not "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Held by armed agents in such a high stress situation, Ms. Terrill was unable to make a "free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). The fact that she disclosed her passcode, even for a limited purpose, should not be a basis for finding that she voluntarily relinquished her expectation of privacy in the phone.

The bodyworn camera footage makes clear that while Ms. Terrill told the agent her passcode so he could view a single video, she certainly did not abandon the privacy of her entire

phone. The video of the encounter would have been the last thing saved in her Photos app, easily identifiable without any need to look through the phone to find it. She repeatedly pleaded for the phone to be returned. *See* Exhibit B. The warrant affidavit itself states that "TERRILL . . . told the Agents to play the video from her phone so that it would not be detained." Exhibit A at ¶10.

In a heated moment, Ms. Terrill gave the agent her passcode in an effort to let him see what he needed and then return the phone to her. She did not give up her expectation of privacy in all of the images in her Photos app by giving a limited consent under duress. The Supreme Court has stated that "[a] suspect may of course delimit as he chooses the scope of the search to which he consents." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "In other words, an individual's power to consent to a search necessarily entails the right to withhold consent altogether, to limit the consent search in any manner, to revoke one's consent (prior to the discovery of evidence by police), and to terminate a search already in progress." *United States v. Felix*, 134 F. Supp. 2d 162, 171 (D. Mass. 2001) (granting motion to suppress where defendant's wife gave consent only for officers to search home for firearms in their presence, but they searched the house before she came home). And courts have upheld one's expectation of privacy in a phone's contents where they gave only limited consent. *See, e.g.*, *United States v. Finley*, 477 F.3d 250, 259 (5th Cir. 2007) (defendant had a reasonable expectation of privacy in the contents of a phone issued to him for work but that he was permitted to use for personal purposes, even though the phone was not password-protected and his employer could have read his text messages once he returned the phone); *United States v. Castro*, No. 23-20032-01-DDC, 2024 WL 3989191, at *6 (D. Kan. Aug. 29, 2024) ("Mr. Castro maintained a reasonable expectation of privacy in his Telegram account even after he had consented to a search of his phone. TFO Albers intruded on that reasonable expectation of privacy by impersonating Mr. Castro to generate and receive a passcode.").

Ms. Terrill also maintained a reasonable expectation of privacy in her social media activity. Her accounts on Instagram and Facebook are password-protected. Her private DMs were viewable only by her and the recipient, and her Instagram "For You Page" was viewable only by her after entering her password. The screenshots she took were saved in her Photos app, accessible only by entering her phone's passcode. While her social media comments are publicly viewable, she had a reasonable expectation of privacy in the aggregation of those comments in the screenshots she saved. The government potentially could have served Instagram or Facebook with warrants to disclose the aggregation of her "likes" and "comments," but it did not do so.

Ms. Terrill's use of a phone passcode and social media account passwords indicates her subjective expectation of privacy in her phone, images, and social media activity, but the question remains as to whether that expectation was objectively reasonable. *See Rheault*, 561 F.3d at 5909. The answer is yes.

With regard to the images in her Photos app, accessible only through the phone's passcode, and to which she did not give permission to the agent to access beyond the most recent video, her expectation of privacy was objectively reasonable. *See United States v. Taylor*, 250 F. Supp. 3d 1215, 1225 (N.D. Ala. 2017) ("[C]ourts agree that that individuals have a reasonable expectation of privacy in the contents of their computers." (citing cases discussing recognized privacy interest in cell phones and password-protected files)); *see also Bowers v. County of Taylor*, 598 F. Supp. 3d 719, 729 (W.D. Wis. 2022) (noting the "well-established rule that individuals generally have a reasonable expectation of privacy in locked or closed containers, which are comparable to a password-protected account."); *Hibbert v. Schmitz*, No. 16-CV-3028, 2019 WL 8405217, at *16 (C.D. Ill. Feb. 7, 2019) (plaintiff's "phone was passcode protected" and "by her conduct," plaintiff showed that "she sought to preserve the contents of her phone as private"; court found that "her

12

expectation of privacy in her phone and its contents is one that society is prepared to recognize as reasonable").

More specifically, with respect to the screenshots of her private DMs, courts have recognized that persons enjoy a reasonable expectation of privacy in the content of their digital communications, even when using an app or third-party service. *See, e.g.*, *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) ("a subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial ISP.").

As for the aggregation of her public social media comments through her private screenshots, "the Supreme Court has expressed concerns about the evolving reach of technology in law enforcement surveillance and the aggregate information emerging technologies allow the government to collect." *United States v. Kubasiak*, No. 18-CR-120,a 2018 WL 6164346 at *3 (E.D. Wisc. Aug. 23, 2018). For example, in *Carpenter*, the Court held that the government's acquisition of historical cell site location information from cell phone wireless carriers "invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Carpenter*, 585 U.S. at 313; *see also id.* at 310 ("A person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'" (quoting *Katz v. United States*, 389 U.S. 347, 351-52 (1967)). Similarly, in *United Stages v. Jones*, 565 U.S. 400, 402 (2012), the Court determined that law enforcement attaching a GPS device to the defendant's car and monitoring his movements on public roads for four weeks constituted a warrantless search. *See also id.* at 430 (Alito, J., concurring) (while "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy our

society has recognized as reasonable, the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy"). *Carpenter* and *Jones* support Ms. Terrill's contention that while her individual comments may have been visible to the public, the aggregation of those comments were only accessible through her passcode-protected Photos app. The compilation showed a history of her activity, which she reasonably expected to remain private.

Accordingly, Ms. Terrill had a reasonable expectation of privacy in the: (1) screenshots of private DMs with another Instagram account; (2) screenshots of her comments on Instagram posts; (3) a screenshot of a post on her Instagram "For You Page"; (4) screenshots of her comments on Facebook posts; (5) a screenshot of one of her Facebook posts; (6) a screenshot of another Facebook profile posting screenshots of her comments; (7) a screenshot of a Pod Save America podcast episode on Charlie Kirk's assassination; (8) two pictures of her holding a firearm on an undisclosed date; and (9) a picture of a meme referencing a firearm. Ms. Terrill maintains that she was under duress when she gave the agent limited consent to view the video of the encounter, but she is not moving to suppress: (10) a still frame of the video she took during the encounter, depicting a police officer wearing a mask; and (11) the video of part of the encounter.

### B. The warrant affidavit did not establish probable cause that Ms. Terrill had committed a crime.

Agent Nemis stated she was investigating Ms. Terrill "for threatening to assault or murder a federal law enforcement officer" in violation of 18 U.S.C. § 115(a)(1)(B). Exhibit A at ¶3. That statute criminalizes:

> **(a)(1)** Whoever--
>
> . . .
>
> **(B)** threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section,

> with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished as provided in subsection (b).

18 U.S.C. § 115(a)(1)(B). In the First Circuit, the standard for whether a defendant may be convicted under this statute for making a "threat" is "whether he should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it is made." *United States v. Fulmer*, 108 F.3d 1486, 1491 (1st. Cir. 1997). The court explained:

> This standard not only takes into account the factual context in which the statement was made, but also better avoids the perils that inhere in the "reasonable-recipient standard," namely that the jury will consider the unique sensitivity of the recipient. We find it particularly untenable that, were we to apply a standard guided from the perspective of the recipient, a defendant may be convicted for making an ambiguous statement that the recipient may find threatening because of events not within the knowledge of the defendant. Therefore, we follow the approach of several circuits by holding that the appropriate focus is on what the defendant reasonably should have foreseen.

*Id.* at 1491-92.

Applying these standards, it is clear that Agent Nemis did not establish probable cause that Ms. Terrill had violated the statute. To be sure, probable cause "is not a high bar" and demands only a "fair probability" that that a crime has been committed. *United States v. Cortez*, 108 F.4th 1, 8 (1st Cir. 2024). But the agent failed to meet even this basic standard.

The warrant affidavit states that at the time of the alleged threat, the "agents were leading [the target of the arrest] to the car[.]" Exhibit A at ¶10. Significantly, the FBI agent who was directly interacting with Ms. Terrill "was initially walking in the opposite direction of TERRILL" when she uttered her statement. *Id.* The bodycam video footage shows this clearly, that Ms. Terrill uttered the statement as she was parting ways with the agents and turning her back to them. It also

shows her slight build and that she was wearing a fitted tank top under an open flannel shirt and a small purse. She was not carrying a large bag or anything suspicious. She had her phone in one hand and court paperwork in the other. On the other side were several armed, trained law enforcement officers. It is untenable that she could have "reasonably foreseen that the statement [s]he uttered would be taken as a threat by those to whom it [was] made." *Fulmer*, 108 F.3d at 1491. Had she foreseen that her statement would be viewed as threatening, she would not have turned her back to armed, trained federal agents. She would have done something to protect herself – whether to guard her body or at least continue video recording the agents on her phone, which she had faced the other way when she turned. *See* Exhibit B. The lack of probable cause is also supported by the agents' reaction to her statements, which was not to draw weapons or call for backup, but to detain Ms. Terrill and release her not long after.

There is nothing in the warrant affidavit to suggest or even allege that Ms. Terrill planned the confrontation in advance or was working with other people or organized groups. This was not a planned act of civil disobedience. As the affidavit states, Ms. Terrill was "a bystander walking toward the entrance of the courthouse[.]" Exhibit A at ¶8. She spontaneously interacted with the agents upon observing what she believed to be an unlawful detention. She was expressing her political views, not threatening the officers or putting them in harm's way. As a result, the warrant affidavit did not establish probable cause that Ms. Terrill had committed a crime for which intrusion into her private property would be reasonable under the Fourth Amendment.

### C. The warrant affidavit did not establish a nexus between evidence of the alleged crime and Ms. Terrill's cell phone.

Even if one were to accept for the purpose of argument that the affidavit did establish probable cause of a crime, it did not show a nexus between evidence of that alleged crime and Ms. Terrill's cell phone, aside from the uncontested video and still image of the encounter itself. The

affidavit did not allege facts that set out a "fair probability," *Corleto*, 56 F.4th at 175, that any other evidence of Ms. Terrill's alleged "threat" with "intent to impede, intimidate, or interfere," 18 U.S.C. § 115(a)(1)(b), would be found on the phone.

The affidavit, again, states that Ms. Terrill was simply "a bystander walking toward the entrance of the courthouse" when she pushed through the agents in an attempt to help the target of their arrest. Exhibit A at ¶9. The bodyworn camera footage shows that she noticed the target being arrested but did not appear to know him or have prior knowledge of the arrest. The encounter was unplanned and spontaneous. There was no basis to suggest that evidence of Ms. Terrill's intent in that moment – interacting with agents she had just encountered – could be found on the phone. The affidavit itself stated that Ms. Terrill was "a previously unknown individual." *Id.* at ¶7.

The "people, entities, physical addresses, telephone numbers" related to Malden District Court, Charlie Kirk, and federal immigration officers is not only irrelevant to whether Ms. Terrill could have "reasonably foreseen" that the agents she interacted with would have viewed her statement as a threat, there was no basis to believe that information would be on Ms. Terrill's phone. *See* Exhibit A at Attachment B. If such a threadbare showing were enough, the warrant could have authorized a search of any information source Ms. Terrill had utilized prior to arriving at the courthouse. Moreover, there is no allegation or reason to believe that Ms. Terrill had anything to do with Charlie Kirk's death weeks prior or was organizing with groups to take action against immigration enforcement. There was no basis to believe any evidence of research or premeditation for the encounter would be found on the phone.

Similarly, the idea that "[e]vidence of the defendant's intent" is related to "information related to immigration enforcement, violence against law enforcement, and the assassination of Charlie Kirk," *see id.*, misunderstands the *Fulmer* standard of whether Ms. Terrill could have

17

"reasonably foreseen" the agents in question would perceive her statement as a threat. Those agents had no idea what was on Ms. Terrill's phone, what conversations she was having on social media, or anything beyond her words and actions that day. What Ms. Terrill told those agents about her political views and opinion about Charlie Kirk immediately before she made the statement in questions is already captured in her uncontested video, to which she already facilitated access, as well as the agents' bodyworn camera footage. There was no basis to contend that any additional evidence shedding light on her intent behind an unprompted statement could be found on her phone.

The affidavit did not state in any form that there was a likelihood that Ms. Terrill had traveled to Malden for the purpose of a direct action or was working with outside groups. The affidavit consists of a summary of the incident and boilerplate language regarding the use of cell phones and their storage capacity. It included an arbitrary, generic list of what people in general do with their phones without drawing any connection to Ms. Terrill or the encounter at issue. *See id.* at ¶14 (people use their phones for messaging and email, keeping a calendar, arranging travel, making purchases, banking, running searches, etc.).

Furthermore, Agent Nemis stated she had been working for the FBI for only about one year; she did not have stated or extensive experience in investigating threats cases, organized groups, or anything analogous to the allegations. She stated, in vague terms, only that she had investigated "various criminal offenses." *Id.* at ¶2. She had no requisite experience to rely on in providing a basis for the alleged nexus.

The application for the warrant did not establish a nexus to Ms. Terrill's phone, and therefore, it was invalid and did not authorize a lawful search.

**D. The warrant was not sufficiently particularized and authorized a general search of Ms. Terrill's cell phone.**

The warrant as issued was not sufficiently particularized to "prevent [a] wide-ranging general search[]," *Corleto*, 56 F.4th at 175, and thereby unlawfully authorized "general, exploratory rummaging in [Ms. Terrill's] belongings." *Coolidge*, 403 U.S. at 467. The warrant did not provide enough specificity to "guide and control" the search and seizure and "include[d] items that should not be seized." *Lindsey*, 3 F.4th at 40. Because of the insufficient particularity, the resulting evidence should be suppressed.

The list of items in Attachment B of the warrant is nearly unlimited by time and overbroad in substance. In paragraph A of Attachment B, the warrant authorized a search for evidence related to "people, entities, physical addresses, telephone numbers" of Malden District Court, Charlie Kirk, and federal immigration officers. Exhibit A at Attachment B. Interestingly, the October 9, 2025 warrant included a temporal limitation in paragraph A from "September 15, 2025 to September 29, 2025," but the October 23, 2025 warrant eliminated that particularity.

Paragraph D authorized a search for "[e]vidence of the defendant's intent, including information related to immigration enforcement, violence against law enforcement, and the assassination of Charlie Kirk." *Id.*

Most broadly, paragraph H stated simply "[e]vidence of the times the equipment was used," without designating for what purpose, let alone a criminal one. This paragraph alone could include *anything* Ms. Terrill did with her phone, which is the conduit through which she operates innumerable aspects of her life.

None of these paragraphs are limited by time and unlawfully authorized unlimited perusal of Ms. Terrill's photographs, social media, and digital activity. This is cause for concern. *Cf. United States v. Zelaya-Veliz*, 94 F.4th 321, 340 (4th Cir.), *cert. denied*, 145 S. Ct. 571 (2024) ("This total lack of a time period in a social media warrant raises a problem. As our society moves

further into the digital age, Facebook and other social media accounts are beginning to contain decades of personal information and communications, often going back to an account holder's early teenage years. These social media accounts, much like cell phones, frequently contain "a broad array of private information never found" during a traditional search of a home." (quoting *Riley*, 573 U.S. at 397); *see also United States v. Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) ("Where a warrant authorizes the search of a residence, the physical dimensions of the evidence sought will naturally impose limitations on where an officer may pry[.] ... Such limitations are largely absent in the digital realm[.]").

The fact is that aside from the video of the encounter, the government had no reason to believe anything related to the incident would be found on Ms. Terrill's phone, so it requested a general warrant to try to find information it could argue was relevant. The Supreme Court has strongly guarded against such "rummaging," *Coolidge*, 403 U.S. at 467, and the warrant was therefore invalid.

By authorizing a search for anything related to the death of Charlie Kirk, the warrant opened the door to a general search. The warrant did not specify what type of material would be relevant, and indeed, the fruits of the search included everything from social media debates over Mr. Kirk's character and a screenshot of a podcast episode regarding his assassination. None of these materials had any bearing on Mr. Terrill's intent or actions on September 29.

The timing of the fruits of the search underscore the overbroad nature of the warrant. The meme referencing a firearm is dated May 17, 2025 – more than four months prior to the September 29 incident. Most of the social media screenshots are from around the time of Charlie Kirk's death on September 10, more than two weeks prior to the encounter. The images of Ms. Terrill holding a firearm were taken on an undisclosed date, perhaps long before the date at issue. None of the

20

fruits beyond the images of the encounter itself are tied to the alleged probable cause. None of these images are "evidence" of the crime because they are temporally and substantively too attenuated from the interaction between Ms. Terrill and the agents outside the courthouse.

### E. Even if the warrant was valid, the search of Ms. Terrill's cell phone exceeded the scope of the warrant.

Relatedly, the evidence seized pursuant to the warrant went outside of the scope defined by the alleged probable cause. Agent Nemis stated she was investigating Ms. Terrill for threatening a federal officer on September 29, 2025. Exhibit A ¶3. The evidence seized, however, exceeded this scope by including images beyond the video and date of the encounter.

For example, the warrant authorized a search for evidence of "violence against law enforcement," Exhibit A at Attachment B, but the images of Ms. Terrill holding a firearm and the meme referencing a firearm had nothing to do with law enforcement. The warrant also authorized evidence of Ms. Terrill's "intent," which would include information close in time to September 29. But the agents seized screenshots of comments she had made weeks prior. The fruits of the search were untethered from the probable cause asserted.

### F. The plain view exception does not apply where the only image relevant to the investigation was the most recent video, and the agents had no reason to venture further into the Photos app.

If the Court determines that Agent Nemis established probable cause that Ms. Terrill committed a crime, the only relevant evidence of that crime would be the video and the still frame of the video. The video would have been most recently saved in Ms. Terrill's Photos app. It was easily accessible and did not require rummaging through her phone to access. The bodyworn camera footage shows that Ms. Terrill believed the agent could view her video and return her phone to her.

Any assertion by the government that the other images seized were in plain view when the agents opened Ms. Terrill's Photos app cannot stand. First, the executing agent had no basis to go further into the history of Ms. Terrill's Photos app. Second, the incriminating nature of the screenshots would not have been immediately apparent from the gallery display of small icons in the Photos app. The agent would need to open each image to read the contents.

The images were not in "plain view" as defined by the requirements of *Horton v. California*, 496 U.S. 128, 141 (1990).

### G. The good faith exception does not apply where the warrant was not premised on probable cause and insufficiently particularized.

Finally, the good faith exception does not apply. It was not reasonable for the executing agent to rely on the warrant for the reasons described above. The warrant affidavit was lacking in probable cause that a crime was committed. It failed to establish a nexus between evidence of that crime and Ms. Terrill's phone. And the warrant "fail[ed] to particularize the place to be searched or the things to be seized" such that no officer could reasonably presume it to be valid. *Leon*, 468 U.S. at 923.

In addition, the executing agent went beyond the scope of the warrant. *See United States v. Fucillo*, 808 F.2d 173, 177 (1st Cir. 1987) ("The good faith exception [] will not be applied unless the officers executing search warrants, at the very minimum, act within the scope of the warrants and abide by their terms.").

### IV.    CONCLUSION

For the foregoing reasons, Ms. Terrill moves this Court to suppress the fruits of the unlawful search of her cell phone.

> Respectfully submitted,
>
> BETHANY TERRILL,

22

By her attorneys,

/s/ *Samia Hossain*
Samia Hossain

/s/ *Eliza Jimenez*
Eliza Jimenez

/s/ *Jessica Thrall*
Jessica Thrall

Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061

## CERTIFICATE OF SERVICE

I, Samia Hossain, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 5, 2026.

/s/ *Samia Hossain*
Samia Hossain